FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND
2018 APR 20 AM 10: 16
CLERK'S OFFICE
AT BALTIMORE
BY_____DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KRISTINA MUELLER, *et al.*

*Plaintiffs*,

v.

CHESAPEAKE BAY SEAFOOD
HOUSE ASSOCIATES, LLC

*Defendant.*

Civil Action No. ELH-17-1638

## MEMORANDUM OPINION

In this wage dispute litigation, plaintiffs Kristina Mueller and Jill Mueller[1] have filed a collective action against Chesapeake Bay Seafood House Associates, LLC ("Chesapeake Bay"), seeking, *inter alia*, unpaid minimum and overtime wages for work performed at restaurants owned or operated by Chesapeake Bay. *See* ECF 1 ("Complaint"). Plaintiffs lodge their claims under the Fair Labor Standards Act of 1938 ("FLSA"), codified, as amended, at 29 U.S.C. §§ 206, 207(a), and 216(b); the Maryland Wage and Hour Law ("MWHL"), Md. Code (2016 Repl. Vol., 2017 Supp.), §§ 3-401 *et seq.* of the Labor and Employment Article ("L.E."); and the Maryland Wage Payment and Collection Law ("MWPCL"), L.E. §§ 3-501 *et seq.*

The Complaint lodges a collective action pursuant to the FLSA (*id.* ¶¶ 79-101), and includes a Rule 23 class action as to the MWHL and MWPCL claims. *Id.* ¶¶ 102-112. Defendant answered the Complaint. ECF 7.

By agreement, the Court approved plaintiffs' Motion for Conditional Certification of the collective action. *See* ECF 9 (Motion); ECF 12 (Order). Unhappy with response to the notice, plaintiffs have filed a "Motion for Additional Court-Authorized Notice of Lawsuit" (ECF 110),

---

[1] Because Kristina and Jill Mueller have the same last name, I shall refer to them by their first names, when necessary, to avoid confusion.

supported by a memorandum of law (ECF 110-1) (collectively, the "Motion"), and several exhibits. *See* ECF 110-3 through ECF 110-10. Chesapeake Bay opposes the Motion (ECF 128, "Opposition"), with exhibits. *See* ECF 128-1 through ECF 128-4. Plaintiffs have replied. ECF 138 ("Reply").

The Motion is fully briefed and no hearing is necessary to resolve it. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion in part and deny it in part.

## I. Factual and Procedural Background[2]

The Muellers are former employees of Chesapeake Bay (ECF 1, ¶¶ 16-17), which owns or operates multiple Chili's and On The Border restaurants in Maryland, Virginia, and West Virginia. *Id.* ¶¶ 5-8. Between approximately January 2006 and October 2014, Kristina was employed by defendant as a server and bartender at Chili's restaurants located in Bowie and Linthicum, Maryland. *Id.* ¶¶ 16, 46-47. Between approximately October 2005 and October 2014, Jill worked for defendant as a bartender, server, and shift manager (*id.* ¶ 44 n.2), also at Chili's restaurants in Bowie and Linthicum. *Id.* ¶¶ 17, 51, 53.

Pursuant to 29 U.S.C. § 216(b), plaintiffs filed a "Motion for Conditional Certification and to Facilitate Identification and Notice to Similarly-Situated Employees" (ECF 9), along with a supporting memorandum of law (ECF 9-1) (collectively, "Motion for Conditional Certification") and two exhibits. *See* ECF 9-2; ECF 9-3. They asked the Court to "grant conditional certification of a collective class for the claims alleged in this matter under the Fair Labor Standards Act." ECF 9-1 at 1. They also asked the Court to assist in the "identification and notice to similarly situated employees" (*id.*), by allowing an "early Court-approved notice of this action" and by "allowing potential opt-ins to join this matter." *Id.* at 3.

---

[2] I shall limit the factual and procedural background to include only matters of relevance to the Motion.

Thereafter, the parties filed a "Joint Status Report and Stipulation Regarding Conditional Certification" (ECF 10) (hereinafter, "Joint Stipulation"), informing the Court that Chesapeake Bay did not oppose conditional certification of a collective action, and that the parties had agreed to the terms of the proposed notice and opt-in forms. *See id.* ¶ 3. Additionally, the parties agreed, *id.* ¶¶ 4-5:

> [W]ithin thirty (30) calendar days of the Court's approval of the proposed Notice, Defendant is to produce directly to Plaintiffs' counsel a list of the full name and last known residential address of each and every individual who is or was employed as a server and/or bartender for Defendant during the period of June 15, 2014 until June 15, 2017.
>
> \* \* \*
>
> [And] that putative class members will have a period of sixty (60) calendar days from the date that the Notice is mailed to submit a form consenting to join the lawsuit (the "Notice Period"). The Parties have agreed that the Notice Period will commence ten (10) business days from the date Plaintiffs are provided with the list of potential class members from Defendant.

By Order of September 22, 2017 (ECF 12), I granted the Motion for Conditional Certification (ECF 9). In addition, I approved the Joint Stipulation (ECF 10), the proposed notice (ECF 10-1, "Notice"), and the proposed opt-in form (ECF 10-2, "Opt-In Form"). Thereafter, Chesapeake Bay provided plaintiffs with the names and addresses of 2,805 current and former Chesapeake Bay employees. ECF 110-1 at 1. Plaintiffs aver that Notice and Opt-In Forms were timely mailed to all of the current and former employees at the addresses provided. ECF 138 at 1. The deadline for potential class members to join the lawsuit was December 29, 2017. *See* ECF 128 at 4. The Court received more than 115 Opt-In Forms. *See* ECF 14 through ECF 109; ECF 111 through ECF 127; ECF 129 through ECF 137; ECF 139; ECF 142 through ECF 144; ECF 147.

In the Motion (ECF 110), filed on December 14, 2017, plaintiffs claim that a "substantial

portion of the potential class have not received notice of the lawsuit." *Id.* at 1. Further, they claim that Chesapeake Bay has "made improper contacts with members of the prospective class" by presenting an arbitration agreement to its current employees (hereinafter, the "Arbitration Agreement" or "Agreement"). *Id.* The relevant terms of the Arbitration Agreement are discussed, *infra*.

In the Motion, plaintiffs asks for several forms of relief, including (1) "an Order compelling Defendant to produce to Plaintiffs' counsel . . . a list of the last known email address of every individual listed on the class list who has yet to join this matter"; (2) that plaintiffs "be allowed to send additional class notice by mail and email to all prospective class members"; (3) an extension of the opt-in deadline; and (4) that "additional language" be "included in the notice to make clear to all prospective plaintiffs that the signing of and/or distribution of an arbitration agreement does not prevent them from joining this lawsuit." ECF 110-1 at 8-9.

Additional facts are included in the Discussion

## II. Discussion

### A.

Congress enacted the FLSA in 1938 "to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'" *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) (quoting 29 U.S.C. § 202(a)) (alterations in *Barrentine*); *see Encino Motorcars, LLC v. Navarro*, ___ U.S. ___, 136 S. Ct. 2117, 2121 (2016); *Morrison v. Cty. of Fairfax, Va.*, 826 F.3d 758, 761 (4th Cir. 2016); *McFeeley v. Jackson Street Entertainment, LLC*, 825 F.3d 235, 240 (4th Cir. 2016). In particular, the FLSA established the "general rule that employers must compensate each

employee 'at a rate not less than one and one-half times the regular rate' for all overtime hours that an employee works." *Darveau v. Detecon, Inc.*, 515 F.3d 334, 337 (4th Cir. 2008) (quoting 29 U.S.C. § 207(a)(1)); *see Perez v. Mrtg. Bankers Ass'n*, ___ U.S. ___, 135 S. Ct. 1199, 1204 (2015); *Integrity Staffing Solutions, Inc. v. Busk*, ___ U.S. ___, 135 S. Ct. 513, 516 (2014); *see also Encino Motorcars, LLC v. Navarro*, ___ U.S. ___, 138 S. Ct. 1134, 1138 (2018); *Harbourt v. PPE Casino Resorts Md., LLC*, 820 F.3d 655, 658 (4th Cir. 2016).

Thus, the FLSA is now "best understood as the 'minimum wage/maximum hour law.'" *Trejo v. Ryman Hospitality Properties, Inc.*, 795 F.3d 442, 446 (4th Cir. 2015) (citation omitted). In *Monahan v. County of Chesterfield, Virginia*, 95 F.3d 1263, 1266-67 (4th Cir. 1996), the Court said: "The two central themes of the FLSA are its minimum wage and overtime requirements . . . . The FLSA is clearly structured to provide workers with specific minimum protections against excessive work hours and substandard wages." (Internal quotations omitted).

Under 29 U.S.C. § 216(b), a plaintiff may maintain a collective action against his or her employer. *Quinteros v. Sparkle Cleaning, Inc.*, 532 F. Supp. 2d 762, 771 (D. Md. 2008). The district court has the discretion to "facilitat[e] notice to potential plaintiffs", and the "broad authority" to exercise control over a collective action and to govern the conduct of counsel and parties in the collective action. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981) (discussing Rule 23 class actions); *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169-71 (1989) (extending reasoning of *Gulf Oil* to collective actions and affirming the power of district courts to exercise control over collective actions); *Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682, 686 (D. Md. 2010); *Randolph*, 41 F. Supp. 3d at 465 (quoting *Gulf Oil Co*, 452 U.S. at 100) ("A district court has 'the duty and broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties.'").

Generally, when assessing whether to certify a collective action pursuant to the FLSA, district courts in this circuit adhere to a two-stage process. *See, e.g., Butler v. DirectSAT USA, LLC*, 876 F. Supp. 2d 560, 566 (D. Md. 2012); *see also Flores v. Unity Disposal & Recycling, LLC*, GJH-15-196, 2015 WL 1523018, at *2-3 (D. Md. Apr. 2, 2015); *Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, 300 (D. Md. 2007). "In the first stage, commonly referred to as the notice stage, the court makes a threshold determination of whether the plaintiffs have demonstrated that potential class members are similarly situated, such that court-facilitated notice to putative class members would be appropriate." *Butler*, 876 F. Supp. 2d at 566 (internal quotations omitted).[3]

The second stage is sometimes referred to as the decertification stage. *Id.* "In the second stage, following the conclusion of discovery, the court engages in a more stringent inquiry to determine whether the plaintiff class is [in fact] similarly situated in accordance with the requirements of § 216, and renders a final decision regarding the propriety of proceeding as a collective action." *Syrja*, 756 F. Supp. 2d at 686 (internal quotations and citations omitted) (alterations in *Syrja*).

Notably, "the court has a managerial responsibility to oversee the joinder of additional

---

[3] Section 216(b) "establishes an 'opt-in' scheme, whereby potential plaintiffs must affirmatively notify the court of their intentions to be a party to the suit." *Quinteros*, 532 F. Supp. 2d at 771. To join an FLSA collective action, each party plaintiff must consent in writing. *See* 29 U.S.C. § 216(b). This is referred to as "opting-in" to the action. *See Stransky v. HealthONE of Denver, Inc.*, 929 F. Supp. 2d 1100, 1105 (D. Colo. 2013); *see also Hoffmann-La Roche, Inc.*, 493 U.S. at 170 (noting that a collective action affords plaintiffs the "advantage of lower individual costs to vindicate rights by the pooling of resources" and the "judicial system benefits by efficient resolution in one proceeding of common issues of law and fact"). *Hoffmann-La Roche, Inc.* involved a suit brought under the Age Discrimination in Employment Act ("ADEA"), codified at 29 U.S.C. § 621 *et seq.* Section 7(b) of the ADEA incorporates the enforcement provisions of the FLSA, including 29 U.S.C. § 216(b). *See* 29 U.S.C. § 626(b). Courts have looked to *Hoffman-La Roche, Inc.* in the context of FLSA cases. *See, e.g., Randolph v. PowerCp Const., Inc.*, 41 F. Supp. 3d 461, 465 (D. Md. 2014).

parties to assure that the task is accomplished in an efficient and proper way." *Hoffmann-La Roche, Inc.*, 493 U.S. at 170-71. This includes the "authority to manage the process of joining multiple parties in a manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure." *Id.* at 170. The court also has authority over the conduct of counsel, to avoid confusion or unfairness. *Id.* at 169-71. As the Supreme Court noted in *Hoffmann-La Roche, Inc.*, Fed. R. Civ. P. 83 "endorses measures to regulate the actions of the parties to a multiparty suit." 493 U.S. at 172 (citing *Gulf Oil*, 452 U.S. at 99 n.10). Pursuant to Rule 83(b), courts are permitted to "'regulate their practice in any manner consistent with'" federal or local rules. *Id.* (quoting Rule 83(b)). Consistent with Rule 83, "courts traditionally have exercised considerable authority 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Hoffmann-La Roche, Inc.*, 493 U.S. at 172-73 (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-631 (1962)).

The "district court also has the responsibility to insure that all parties act fairly while the court decides whether and how the action will move forward under the FLSA." *Billingsley v. City Trends, Inc.*, 560 F. App'x 914, 921 (11th Cir. 2014) (citing *Hoffmann-La Roche, Inc.*, 493 U.S. at 169-71); *see also, e.g., Balasanyan v. Nordstrom, Inc.*, 11-cv-260, 2012 WL 760566, at *1-2, 4 (S.D. Cal. Mar. 8, 2012) (refusing to enforce individual arbitration agreement in an FLSA action because the defendant's imposition of the agreement was an improper class communication); *Williams v. Securitas Sec. Servs. USA, Inc.*, 10-cv-7181, 2011 WL 2713818, at *3 (E.D. Pa. July 13, 2011) (invalidating an arbitration agreement imposed on the defendant's employees during the pre-certification stage of FLSA litigation, and ordering corrective measures because the arbitration agreement was a "confusing and unfair communication" with the potential opt-in plaintiffs); *Ojeda-Sanchez v. Bland Farms*, 600 F. Supp. 2d 1373, 1379-81 (S.D.

Ga. 2009) (granting a limited protective order in an FLSA collective action where the defendants engaged in unsupervised, unsolicited, in-person interviews of the plaintiffs in an environment that encouraged hasty and uninformed decision-making concerning class participation); *Longcrier v. HL-A Co.*, 595 F. Supp. 2d 1218, 1229-30 (S.D. Ala. 2008) (striking declarations obtained through the defendants' abusive and misleading communications with prospective opt-in plaintiffs); *Jones v. Casey's Gen. Stores*, 517 F. Supp. 2d 1080, 1086, 1089 (S.D. Iowa 2007) (limiting the plaintiffs' counsel from affirmatively soliciting potential opt-in plaintiffs to join an FLSA action, and requiring counsel to modify the website to provide "only a *factual, accurate, and balanced* outline of the proceedings") (emphasis in *Jones*); *Maddox v. Knowledge Learning Corp.*, 499 F. Supp. 2d 1338, 1342-44 (N.D. Ga. 2007) (observing that in FLSA § 216(b) actions district courts rely on broad case management discretion by limiting misleading, pre-certification communications; and ordering the plaintiffs to correct false, unbalanced, and misleading statements on their website); *Belt v. Emcare, Inc.*, 299 F. Supp. 2d 664, 667-70 (E.D. Tex. 2003) (sanctioning the employer and enjoining the employer from communicating with potential class members because the employer attempted to subvert the district court's role in the FLSA collective action by unilaterally sending a misleading and coercive letter to potential plaintiffs that discouraged them from joining the suit).

However, when a court limits communication between a party and potential class members, the court's "'discretion is not unlimited.'" *Stransky*, 929 F. Supp. 2d at 1105 (quoting *Gulf Oil*, 452 U.S. at 101). A court "may enter an order limiting communication if it furthers the general principles of class or collective actions." *Randolph*, 41 F. Supp. 3d at 465 (citing *Gulf Oil Co.*, 452 U.S. at 99). Moreover, "an order limiting communications between parties and potential class members should be based on a clear record and specific findings that

reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil Co.*, 452 U.S. at 101. And, the court's order "must be narrowly tailored to avoid impinging upon the parties' constitutional rights of free speech and association." *Stransky*, 929 F. Supp. 2d at 1105 (citing *Gulf Oil*, 452 U.S. at 102); *see also Randolph*, 41 F. Supp. 3d at 465 (citing *Gulf Oil Co.*, 452 U.S. at 101).

In particular, before entering an order limiting communication between a party and potential class members, a court should be satisfied that "a particular form of communication has occurred or is threatened to occur", and that the communication is "abusive in that it threatens the proper functioning of the litigation." *Ross v. Wolf Fire Protection, Inc.*, 799 F. Supp. 2d 518, 526 (D. Md. 2011); *see also Randolph*, 41 F. Supp. 3d at 465. To determine whether a communication was inappropriate in the context of a collective action, courts have considered whether the communication was "misleading, confusing, coercive, or improper." *Stransky*, 929 F. Supp. 2d at 1106.

For example, a communication may be improper if it discourages potential plaintiffs from joining the suit. *See Wright v. Adventures Rolling Cross Country, Inc.*, C-12-982, 2012 WL 2239797 at *5-6 (N.D. Cal. June 15, 2012) ("One example of an improper communication is a communication intended to undermine a class action by encouraging individuals not to join the suit", and noting that "[t]he critical question is whether there is a realistic danger that the communications will chill participation in the class action."). Additionally, a communication may be improper when it is unsupervised and unilaterally initiated by the party. *See Ojeda-Sanchez*, 600 F. Supp. 2d at 1379 (quoting *Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1201 (11th Cir. 1985) ("'Unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the

facts, without opportunity for rebuttal. The damage from misstatements could well be irreparable.'").

The timing of a party's communication to potential class members may render it improper. *See Billingsley*, 560 F. App'x at 919 ("[T]he timing of the arbitration agreement's rollout 'was calculated to reduce or eliminate the number of collective action opt-in Plaintiffs in this case.'"); *see also Williams*, 2011 WL 2713818, at *3 (invalidating an arbitration agreement initiated by the defendant during the pre-certification stage of an FLSA litigation); *Maddox*, 499 F. Supp. 2d at 1342-44 (stating that, in an FLSA collective action, the district court has discretion to limit pre-certification communications between a party and potential class members to avoid, *inter alia*, confusion).

Moreover, an employer-employee relationship between a party and a potential class member increases the risk that a communication from the employer to the employee may be coercive. *See Kleiner*, 751 F.2d at 1202 ("If the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive."); *see also Ross*, 799 F. Supp. 2d at 527 (quoting *E.E.O.C. v. Morgan Stanley & Co.*, 206 F. Supp. 2d 559, 562 (S.D.N.Y. 2002)) ("'Coercion of potential class members by the class opponent may exist if both parties are involved in an ongoing business relationship,'" and some courts have found "'the danger of such coercion between employers and employees sufficient to warrant the imposition of [communication] restrictions.'"); *Ojeda-Sanchez*, 600 F. Supp. 2d at 1379-80 (noting that "a past as well as a potential future employment relationship between the parties" existed and therefore "increase[d] the risk that communications between them will have a coercive effect."); *Belt*, 299 F. Supp. 2d at 668 ("[W]here the absent class member and the defendant are involved in an ongoing business relationship, such as employer-

employee, any communications are more likely to be coercive.").

**B.**

Plaintiffs argue that Chesapeake Bay made "improper contacts" with potential class members by distributing the Arbitration Agreement to current employees. ECF 110 at 1, 5. Defendant counters that the Agreement "provide[s] no basis to require additional notification" because it was "issued only to a small portion (about 20%) of the potential class, expressly carve[s] out this lawsuit and do[es] not affect the right of potential class members to participate in this lawsuit." ECF 128 at 2.

Plaintiffs submitted a copy of the Arbitration Agreement with the Motion. *See* ECF 110-10 at 3-4. It states, in relevant part, that an employee of Chesapeake Bay who signed the Arbitration Agreement is required to arbitrate "claims for wages and other compensation", including "claims for violation of any federal, state, or other government law, statute, regulation, or ordinance, such as, for example, claims under the . . . Fair Labor Standards Act[.]" *Id.* at 3. Further, it provides that the "undersigned [E]mployee . . . and the Company agree to use the arbitration procedures in this Agreement exclusively instead of a trial in court before a judge or jury, unless Employee timely opts out of this Agreement" by "mailing via U.S. Mail, Return Receipt Requested, written notice of the intention to opt out within 30 calendar days of signing this Agreement[.]" *Id.* at 3-4.

However, the Arbitration Agreement does not require arbitration of "any multi-plaintiff, class, collective or representative action filed in state or federal court *prior* to the date Employee received this Agreement where Employee is a current or putative member of such pending multi-plaintiff, class, collective or representative action." *Id.* at 3 (emphasis added). But, if an otherwise exempted lawsuit "is amended *after* the date Employee received this [Arbitration]

Agreement that, through such amendment, would include Employee within its scope", the employee would be required to resolve his or her claim through arbitration with Chesapeake Bay. *Id.* (emphasis added).

As indicated, the potential class of plaintiffs consists of 2,805 former and current employees of Chesapeake Bay. *See* ECF 110-1 at 1. Constance Ohm, Director of Human Resources for Chesapeake Bay, states in her Affidavit (ECF 128-4) that Chesapeake Bay "did not present" the Arbitration Agreement "to any former employees." *Id.* ¶ 3. But, Ohm avers that between August 19 and August 27, 2017, Chesapeake Bay distributed the Arbitration Agreement to 573 current employees, all of whom were potential class members. *Id.* ¶¶ 3-4. The Arbitration Agreement was distributed at "all-employee meetings" or, if an employee was absent from the meeting, at "their next shift." *Id.* ¶ 3. In other words, Chesapeake Bay presented approximately one out of every five potential class members with the Arbitration Agreement. Of the 573 potential class members who received the Arbitration Agreement, only 18 have opted to join this litigation. *Id.* ¶ 5.

Jennifer Temple, a former employee of defendant, avers in her Affidavit (ECF 110-10) that when the Arbitration Agreement was distributed, she worked as a server at one of defendant's Chili's restaurants located in Linthicum. *Id.* ¶ 6. According to Temple, Ken Boyd, defendant's General Manager, and Marty Cohen, defendant's Area Director, presented her and "[n]umerous other employees" with copies of the Arbitration Agreement during a regularly scheduled "monthly meeting" on August 26, 2017. *Id.* ¶¶ 5-6. Temple states that "[t]here were no substantive discussions regarding" the Arbitration Agreement (*id.* ¶ 7), nor did Boyd or Cohen say that employees were required to sign the Agreement. *Id.* ¶ 10. But, she claims that Boyd and Cohen "asked if everyone had signed" the Arbitration Agreement, and they "made it

appear to be a necessity." *Id.* ¶ 10. Temple acknowledges that she is "not certain how the Agreement impacts [her] ability to participate in the current lawsuit." *Id.* ¶ 9.

## C.

Plaintiffs contend that Chesapeake Bay's "agents disseminated arbitration agreements . . . to their current employees" approximately two months after plaintiffs filed this suit, and before certification of the FLSA class. ECF 110-1 at 5; *see also* ECF 110-10 (Temple Affidavit), ¶ 5. According to plaintiffs, the "timeframe in which the agreements were disseminated was sure to confuse and mislead the putative class", and they argue that Chesapeake Bay has "effectively 'chilled' prospective class members from joining" the suit. ECF 110-1 at 6.

Chesapeake Bay asserts that, because this lawsuit commenced before any employee received an Arbitration Agreement, the agreements "expressly do **_not_** apply to this lawsuit." ECF 128 at 8-9 (emphasis in original). Accordingly, Chesapeake Bay contends, without citation to authority, that the distribution of the Arbitration Agreement was not improper. *Id.*

It is uncontested that a particular form of communication occurred between Chesapeake Bay and some 573 potential class members after suit was filed and before the collective action had been certified. *See* ECF 128-4, ¶¶ 2-3; *see also Ross*, 799 F. Supp. 2d at 526; *see also Randolph*, 41 F. Supp. 3d at 465. Thus, I must determine whether the communication was "misleading, confusing, coercive, or improper", *Stransky*, 929 F. Supp. 2d at 1106, and therefore whether it "threatens the proper functioning of the litigation." *Ross*, 799 F. Supp. 2d at 526.

As indicated, 18 of the 573 potential class members who received the Arbitration Agreement have joined this litigation. ECF 128-4, ¶¶ 2-3, 5. In defendant's view, this supports the contention that the Arbitration Agreement has not stifled potential plaintiffs from opting in to this suit. As Chesapeake Bay acknowledges (ECF 128 at 8-9), the Arbitration Agreement does

not require an employee to arbitrate an FLSA wage claim *if* the claim was filed *before* the employee received the Arbitration Agreement. *See also* 110-10 (Arbitration Agreement) (stating that arbitration is not required for "any . . . collective action filed in . . . federal court prior to the date [the] Employee received this Agreement where [the] Employee is a current or putative member of such pending . . . collective . . . action.").

Accordingly, it does not appear that the Arbitration Agreement, by its terms, bars a potential class member from joining this litigation. However, the question is "whether there is a realistic danger", *Wright*, 2012 WL 2239797, at *5-6, that the way in which the Agreement was presented to employees was misleading, confusing, coercive, or otherwise improper as to the potential class members. *Stransky*, 929 F. Supp. 2d at 1106.

As indicated, in the context of an employee-employer relationship, there is an increased risk of coercion when the employer communicates with an employee about litigation for which the employee is a potential plaintiff. *See Kleiner*, 751 F.2d at 1202; *Ojeda-Sanchez*, 600 F. Supp. 2d at 1379-80; *Belt*, 299 F. Supp. 2d at 668. Here, all of the potential class members who received the Arbitration Agreement were employees of Chesapeake Bay. ECF 128-4, ¶¶ 2-3. Indeed, Chesapeake Bay disseminated the Agreement at "all-employee meetings" or, if an employee was absent from the meeting, during the employee's "next shift." *Id.* ¶ 3. Moreover, Temple avers in her Affidavit (ECF 110-10) that the General Manager and Area Director of Chesapeake Bay presented Chesapeake Bay employees with the Arbitration Agreement during a meeting, "asked if everyone had signed" it, and "made it appear to be a necessity." *Id.* ¶¶ 5-6, 10. Moreover, in her Affidavit, Temple avers that Boyd and Cohen did not explain the terms of the Arbitration Agreement when they presented it. *Id.* ¶ 7. Given that potential class members were employed by Chesapeake Bay when they received the Arbitration Agreement, it is

reasonable to infer that at least some felt coerced to sign it.

Moreover, a party's unilateral and unsupervised communication with a potential class member may be improper if there is no opportunity for the opposing party to rebut or correct misleading communications made to the potential class member. *See Ojeda-Sanchez*, 600 F. Supp. 2d at 1379; *see also Kleiner*, 751 F.2d at 1201. Here, the employer unilaterally presented the Arbitration Agreement to 573 potential class members, outside the presence of opposing counsel, and without approval of the Court. Accordingly, there was no opportunity for opposing counsel or the Court to inform the 573 potential class members that the terms of the Arbitration Agreement would not preclude them from joining this litigation and that they would not be penalized if they chose to do so.

Further, the timing of a party's communication to potential class members, especially when the communication occurs prior to class certification, may render that communication improper. *Williams*, 2011 WL 2713818, at *3; *see also Billingsley*, 560 F. App'x at 919; *Maddox*, 499 F. Supp. 2d at 1342-44. Ohm states that defendant presented the 573 potential class members with copies of the Arbitration Agreement during the period between August 19 and 27, 2017. ECF 128-4, ¶ 3. Thus, the rollout of the Arbitration Agreement occurred approximately two months after suit was filed on June 15, 2017 (*see* ECF 1), and one month before the parties stipulated to the terms of the conditional certification. *See* ECF 10; ECF 12; ECF 13. Accordingly, 573 potential class members received the Arbitration Agreement before receiving the Notice.

The timing of the Arbitration Agreement's dissemination to potential class members, whether or not intentional, may have confused potential class members as to their ability to opt-in to this litigation. *See Billingsley*, 560 F. App'x at 919. Moreover, the Agreement may have

dissuaded potential class members from joining this litigation.

Accordingly, the dissemination of the Arbitration Agreement to potential class members may have created confusion in the context of this FLSA collective action litigation. *See Wright*, 2012 WL 2239797, at *5-6. Therefore, potential class members who received the Arbitration Agreement are entitled to new notice, including language making clear that the Arbitration Agreement does not prevent them from joining this litigation.

### D.

Plaintiffs contend that the number of potential class members who have opted-in to this litigation is "abnormally low." ECF 110-1 at 4. They infer that many potential class members "failed to receive notice." ECF 110-1 at 3. Therefore, plaintiffs ask the Court to order Chesapeake Bay to provide plaintiffs with the email addresses of all potential class members, and to allow a second round of notices as to all potential class members who have not yet joined the litigation. *See id.* at 1, 8-9. Plaintiffs provide no authority in support of their requests.

As indicated, Chesapeake Bay provided plaintiffs with a list of the names and addresses of 2,805 current and former Chesapeake Bay employees. ECF 110-1 at 1. Plaintiffs filed with the Court the Opt-In Form of approximately 115 individuals, or approximately 4% of the potential class. *Id.* at 2; *see also* Docket.

But, some 357 copies of the Notice and Opt-In Form were returned to plaintiffs as "undeliverable." ECF 110-1 at 2; *see also* ECF 110-3 (list of employees for whom Opt-In Forms and Notices were returned as undeliverable). After plaintiffs informed Chesapeake Bay about the undeliverable documents, Chesapeake Bay provided plaintiffs with a list of 100 updated addresses. ECF 110-1 at 2; *see also* ECF 110-4 (list of updated addresses). But, plaintiffs complain that "correct addresses for the remaining" 257 individuals "are still unknown." ECF

-16-

110-1 at 2. Moreover, plaintiffs state that, since the initial 357 Opt-In Forms and Notices were returned as undeliverable, 49 additional copies of the Notice and Opt-In Form have been returned as undeliverable. *Id.*; *see also* ECF 110-5 (list of additional Notices and Opt-In Forms returned as undeliverable). It is not clear if defendant has provided any updated addresses as to the additional 49 copies of the Notice and Opt-In Form that were returned as undeliverable.

In sum, it appears that Notice and Opt-in Forms were returned as undeliverable for more than 400 potential class members. *See* ECF 128 at 8.

Plaintiffs also submitted the affidavits of several opt-in plaintiffs who aver that they did not receive an Opt-In Form or Notice during the opt-in period. They claim that they learned about the lawsuit when contacted by another potential class member. *See* ECF 110-6 (Affidavit of Stephanie Tamburrino), ¶¶ 5-6; ECF 110-7 (Affidavit of Heather Biesel), ¶¶ 5-6; ECF 110-8 (Affidavit of Stephanie Travers), ¶¶ 5-6; ECF 110-9 (Affidavit of Jennifer Temple, dated December 12, 2017), ¶¶ 5-6. Plaintiffs state, ECF 110-1 at 2 (internal citations omitted):

> Plaintiffs have had discussions with many who have opted-in. One such interview was with opt-in Plaintiff Eliana Lawson (hereafter, "Lawson"). Lawson advised that nine (9) of her former colleagues never received the class notice. All nine (9) of these putative class members were identified on the class list. Of these nine (9) individuals, only two (2) were identified on the list of persons who failed to receive notice due to having a non-working address.
> The other seven (7) individuals were not included on the list of three-hundred and fifty-seven (357) persons whose notices were returned undeliverable. The reason they failed to receive notice is still unclear.

Defendant counters that the "fact that Plaintiffs have received a lower-than-expected response to the opt-in mailings is not a sufficient reason for Plaintiffs to revisit and change the procedure to which they agreed" in the Joint Stipulation. ECF 128 at 6. Further, defendant argues that, as a precondition to the Joint Stipulation, plaintiffs "agreed to forego other forms of notification, including email notification, in exchange for Defendant's . . . concession to not

oppose Plaintiffs' Motion for Conditional Certification." *Id.*; *see also* ECF 128-1 (email from counsel for defendant to counsel for plaintiff, dated September 22, 2017). Like plaintiffs, defendant has submitted no legal authority supportive of its argument.

The question before the Court is whether plaintiffs may issue a second round of notices and, if so, to whom. As discussed earlier, at length, the Court has "broad authority" to manage the provision of notice in a collective action suit. *See Gulf Oil Co.*, 452 U.S. at 100; *Hoffmann-La Roche, Inc.*, 493 U.S. at 169-71; *Randolph*, 41 F. Supp. 3d at 465. Notably, defendant concedes that additional notice may be appropriate as to "the 406 individuals whose mail was returned as undeliverable (provided that Defendant has email addresses for them)." *Id.* at 8. Because those potential class members apparently never received notice informing them of this litigation, I agree that additional notice is appropriate as to them.

Moreover, judges of this Court have approved the use of email notice in FLSA suits. *See Scalczyk v. CBC Nat'l. Bank,* RDB-15-2011, 2017 WL 86014, at *6 (D. Md. Jan. 10, 2017) (stating that the use of email notice in an FLSA collective action is the "norm"); *Arnold v. Acappella LLC*, BPG-15-3001, 2016 WL 5454541, at *4 (D. Md. Sept. 29, 2016) ("This court has recognized that e-mail communication is 'now the norm' and in numerous cases has directed FLSA defendants to produce such information."); *Butler*, 876 F. Supp. 2d at 575 ("Plaintiffs may . . . notify other potential plaintiffs of this action by first-class mail and by email using the court-approved notice . . . ."). Because the parties appear to lack mailing addresses for these potential class members, I will permit notification by email and by U.S. mail.

As noted, plaintiffs theorize that too few potential class members have opted-in to this litigation. ECF 110-1 at 4. Therefore, they ask that a second round to notices be sent by email to all potential class members who have not opted-in to this litigation. *Id.* at 8. In my view,

plaintiffs engage in mere speculation as to the reason why these potential class members did not opt-in to the suit. *Id.* at 4-5. Therefore, I shall deny the request for a second round of notices to all potential class members who have not opted in. However, new notices shall be provided to those former and current employees whose prior notices were returned as undeliverable, and to those former and current employees who were presented with the Arbitration Agreement.

### III. Conclusion

For the foregoing reasons, plaintiffs' Motion shall be granted in part and denied in part. An Order follows.

Date: April 20, 2018

/s/
Ellen Lipton Hollander
United States District Judge